UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 21-CR-528 (KMK) |
| PATRICK GORYCHKA, | ORDER |
| Defendant. | |

---

KENNETH M. KARAS, United States District Judge:

On January 20, 2023, the Court entered judgment convicting Patrick Gorychka ("Defendant"), after a guilty plea, of one count of possessing child pornography, also known as child sexual abuse material ("CSAM"), in violation of 18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2). (Dkt. No. 74.) Gorychka was sentenced principally to 42 months' imprisonment and five years of supervised release that included three special conditions. (*Id.* at 2–3, 6.) On appeal, Gorychka challenged only the Court's imposition of the three special conditions of supervised release.

On August 28, 2024, the Second Circuit affirmed the Court's imposition of two of the challenged special conditions. *See United States v. Gorychka*, 23-6457-cr, 2024 WL 3964287, at *1–2 (2d Cir. Aug. 28, 2024) (summary order).  With respect to the third special condition—that Gorychka's use of any devices in the course of employment will be subject to monitoring or restriction as permitted by his employer—the Court of Appeals remanded the case, pursuant to *United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994), "so that the District Court may expeditiously provide" (in a "written response") its basis for "determining that a relationship exists between Gorychka's offense conduct and his work, or that monitoring Gorychka's use of

internet-capable devices as part of his employment is reasonably necessary to protect the public." *Gorychka*, 2024 WL 3964287, at *3. This Order is the written response.

## I. Background

A. Gorychka's Possession of Child Pornography and Expression of Interest in Sex with Pre-Teens

The following information is drawn almost entirely from the Presentence Report ("PSR" (Dkt. No. 66)) that was relied upon by the Parties and the Court in imposing sentence.

As described in the PSR, in October 2019, the FBI received information from an FBI Online Undercover Employee ("UC-1") concerning UC-1's communications with an individual, later identified as Gorychka, in a chat room known to be frequented by individuals with a sexual interest in children. (PSR ¶ 7.) During the chats, Gorychka discussed his sexual interest in children and told UC-1 that the youngest teen he had been with was 15. (PSR ¶ 8.) Gorychka complained that "it's hard to find young tho." (*Id.*)

UC-1 told Gorychka that UC-1 had met a "pedo mom" ("UC-2") in New York. (PSR ¶ 9.) Gorychka responded that he wished he could meet people "around here" and said, "that would be hot." (*Id.*) UC-1 told Gorychka that "she keeps kids of illegals while they work for a couple weeks" and "makes some $ on the side." (*Id.*) Gorychka stated, "Omg that's hot." (*Id.*) Gorychka asked UC-1 to connect him to UC-2 and UC-1 agreed, adding UC-2 to UC-1's Kik chat with Gorychka. (PSR ¶¶ 9–10.) After UC-2 entered the chat, Gorychka advised, "I do IT, working with computers" and said that "it pays well lol." (PSR ¶ 10.) From October 31, 2019, until November 16, 2019, UC-2 engaged in communications with Gorychka via Kik messages, and text messages and phone calls to and from Phone-1. (PSR ¶ 11.) On October 31, 2019, in a Kik chat, Gorychka said, "Bass said that you do a lot of babysitting" and "He didn't go into a lot

of detail, but I am interested in a similar setup." (*Id.*) UC-2 asked, "Wht u into?" (*Id.*) Gorychka responded, "Younger, incest, knotting . . . etc." (*Id.*) UC-2 asked, "U ever play or just fantasy???" (*Id.*) Gorychka responded, "The youngest I have been with is 15 . . . and can't seem to find any local girls into knotting." (*Id.*) UC-2 responded, "Mm lil old, wht age u prefer?" (*Id.*) Gorychka responded, "preteens." (*Id.*) UC-2 said, "Mm cool . . . Wht u like to do wit dem?" (*Id.*)_ Gorychka replied, "I wnt to do everything . . . I heard you could potentially facilitate certain things." (*Id.*) UC-2 responded, "Mmm well depends on who it's for, what they would like and what they can offer." (*Id.*) Gorychka said, "Well I don't want to talk a lot . . . but the same as bass," and added, "I have money." (*Id.*)

On November 1, 2019, in a Kik chat, UC-2 asked, "Aight, what u have in mind?" (PSR ¶ 12.) Gorychka responded, "I just want to have a good time." (*Id.*) UC-2 later asked, "Wht u like 2 do?" (*Id.*) Gorychka responded, "I like foreplay, giving and receiving oral and obviously sex lol," and asked, "I have always had a fantasy of being with a younger girl." (*Id.*) UC-2 asked, "How yung?" to which Gorychka responded "I'm not sure lol the younger the better I guess." (*Id.*) Later in the chat, Gorychka asked if UC-2 had "pics of any of the girls you nanny for?" (*Id.*) UC-2 responded, "Yes, but I don't share them on here." (*Id.*)

Later that day, via text message, UC-2 asked Gorychka, "so wht u Like to get off to." (PSR ¶ 13.) Gorychka responded "Incest, yng, knotting." (*Id.*) UC-2 asked if Gorychka had "pics or vides?" (*Id.*) Thereafter, Gorychka sent a photo of an erect penis and two photos of individuals engaging in sexual activity. (*Id.*) UC-2 asked what ages Gorychka enjoyed watching, and Gorychka replied, "9-15." (*Id.*)

On November 2, 2019, Gorychka sent UC-2 a photo of an erect penis via Kik. (PSR ¶ 14.) A U.S. Army uniform hanging on a hanger was visible in the background. (*Id.*) At

3

approximately 2:48 p.m., UC-2 responded on Kik, "Must be watching something good." (*Id.*) Later on November 2, 2019, via Kik, Gorychka said, "I was watching some of these" and included links beginning with "https://mega.nz/." (*Id.*) Thereafter, Gorychka sent additional photos of an erect penis. (*Id.*) UC-2 told him, "Your dick may be too big for my Lizzie." (*Id.*) Gorychka responded, "That's what lube is for" and said, "We definitely need to figure out a time to get together and watch some vids." (*Id.*)

The FBI reviewed the links Gorychka transmitted on November 2, 2019. (PSR ¶ 18.) The links belong to Mega, a New Zealand-based cloud storage platform that permits users to store and share images and videos. (*Id.*) With respect to Mega, a user can send a link to a Mega cloud account to another person, and once the link to the Mega cloud account is transmitted, the person who clicks on the link can access, view and download the files contained in the Mega cloud account. (*Id.*) Based on a review of the material contained within Link-1 and Link-2, it was confirmed that the links contained hundreds of videos and images depicting what appeared to be prepubescent children engaging in sexual activity with other children and with adults. (*Id.*)

On December 2, 2019, a search warrant of Gorychka's residence was executed by FBI agents. (PSR ¶ 20.) During an interview conducted by the FBI agents, Gorychka admitted that he had communicated with someone named "Jane" concerning the possibility of meeting her, however, he claimed that he did not follow through because he got cold feet. (*Id.*) Gorychka also admitted to sending Jane Mega links containing child pornography, and that he communicated with her in a Kik chat using the username "epg84." (*Id.*) The investigation determined that Gorychka possessed in excess of 600 images of child pornography. (*Id.*)

A review of records from a text message application relating to Phone-1, indicate that the subscriber of Phone-1 is "Eric G.," with an associated email address of

4

sexy_soldier84@yahoo.com. (PSR ¶ 19.) Records from the text message application revealed several IP addresses that were accessed, and further revealed that Phone-1 was accessed on November 2, 2019, from one of the identified IP addresses. (*Id.*) The IP address accessed by Phone-1 had a subscriber with address in Orange County, New York, which was later determined to be Gorychka's residence, and in West Point, New York (where Gorychka worked). (*Id.*) Further, Gorychka was identified by FBI agents in a photo wearing a U.S. Army military uniform with a nametag that reads "GORYCHKA," as well as a West Point U.S. Military Academy patch. (*Id.*) Gorychka appeared to have worn the same glasses and have the same hair color and haircut as the individual in Photo-1. (*Id.*) Upon further investigation, Gorychka was identified as a Staff Sergeant with the U.S. Army who was assigned to West Point U.S. Military Academy. (*Id.*)

B. Psychosexual Evaluation

Prior to sentencing, the Probation Office referred Gorychka for an independent psychosexual evaluation with Jennifer A. McCarthy, Ph.D. (*See* PSR ¶ 64.) Dr. McCarthy's report ("Report") indicated that Gorychka acknowledged involvement with adult pornography "throughout his life" but claimed "that, other than his arrest, this behavior has never caused problems in his life" because "'I never felt I was relying on it too much.'" (Report at 6.) When asked to describe his offense conduct, Gorychka told Dr. McCarthy that he had asked the "supposed nanny" for "nudes of her." (*Id.*) Gorychka said, "'I only talked to her about having sex with her. I never talked to the nanny about having sex with the kids.'" (*Id.*)[1] Gorychka told

---

[1] This claim is at odds with the recordings of Gorychka's recorded conversation with UC-2. (*See* PSR ¶ 11 ("Wht u into?" GORYCHKA responded, "Younger, incest, knotting . . . etc." UC-2 asked, "U ever play or just fantasy???" GORYCHKA responded, "The youngest I have been with is 15 . . . and can't seem to find any local girls into knotting." UC-2 responded, "Mm lil old, wht age u prefer?" GORYCHKA responded, "preteens." UC-2 said, "Mm cool . . . Wht

5

Dr. McCarthy that, during his communications with the nanny, he sent her a photo of his erect penis and a photo of himself engaged in sexual activity with a couple.  (Report at 7.)  With respect to his use of adult pornography, Gorychka told Dr. McCarthy that, since the age of 18, he "has viewed and masturbated to this material '3-5 times a week . . . 2-3 hours a week.'"  (Report at 12.)  According to Dr. McCarthy, Gorychka "reported a history of viewing adult pornographic magazines, videos, DVDs, Internet images, and Internet video clips."  (*Id.*)  Dr. McCarthy's Report also notes that Gorychka said that he began viewing child pornography and having fantasies about prepubescent and adolescent girls after accessing child pornography in online chatrooms devoted to adult pornography.  (Report at 13.)  Gorychka admitted that in October and November 2019 he viewed and masturbated to child pornography.  (*Id.*)

Dr. McCarthy concluded that Gorychka had "problems with sexual self-regulation – marked by deviant sexual interests, using sex to cope, and possibly, sexual preoccupation."  (Report at 19.)  Dr. McCarthy found that Gorychka "does not impress as a psychologically minded individual and has little to no insight into the motivating factors that led to his offense."  (Report at 20.)  Dr. McCarthy recommended that Gorychka's mental status be monitored and that he participate in and successfully complete a sex offender treatment program to assist him "in gaining insight into the motivating factors that led to his offense and focus on identifying and decreasing his dynamic risk factors."  (*Id.* at 20–21.)  Dr. McCarthy also recommended that Gorychka "should not view or possess any sexually explicit or suggestive material," that he

---

u like to do wit dem?"  GORCYHKA replied, "I wnt to do everything . . . I heard you could potentially facilitate certain things."  UC-2 responded, "Mmm well depends on who it's for, what they would like and what they can offer."  GORYCHKA said, "Well I don't want to talk a lot . . . but the same as bass," and added, "I have money.").)

should "complete an Internet Management Plan in treatment," and that any access to an Internet-capable device should be monitored by his supervising Probation officer.  (Report at 21.)

The PSR discussed Dr. McCarthy's evaluation, including her conclusion that Gorychka "has problems with sexual self-regulation – marked by deviant sexual interest, using sex to cope, and possibly, sexual preoccupation."  (PSR ¶ 64.)  The PSR also noted that Dr. McCarthy found that Gorychka "does not impress as a psychologically minded individual and has little to no insight into the motivating factors that led to his offense, and could not explain why anyone has been victimized by his conduct."  (*Id.*)  The PSR recognized that Dr. McCarthy concluded that Gorychka displayed "limited insight" into his need for sex offender treatment.  (*Id.*)

The PSR also took note of Dr. McCarthy's recommendation that "the defendant's mental status be monitored, that he should participate in and successfully complete sex offender treatment, and for that treatment to assist the defendant in gaining insight into the motivating factors that led to his offense and focus on identifying and decreasing his dynamic risk factors."  (*Id.*)  Continuing, the PSR noted that "[i]t has also been recommended that the defendant refrain from viewing or possessing *any* sexually explicit or suggestive material, to have monitoring software installed on *any* electronic devices, and to complete an Internet Management Plan during treatment."  (*Id.* (emphasis added).)

C.  Procedural Background

Before or during sentence, Defendant offered no objections to the PSR, either in its factual recitation of the events leading up to his arrest or the inclusion of Dr. McCarthy's report.  (*See generally* Dkt.; Dkt. No. 73 (Sentencing Transcript).)  Nor, for that matter, did Defendant object to the special conditions that the Court announced at sentence and that were included in the recommendations in the PSR.  The Court sentenced Gorychka to 42 months' imprisonment,

which was below the applicable Guidelines Range, to be followed by five years' supervised release. (Dkt. No. 74.) In addition to the standard conditions of supervision, the Court added the three special conditions that were the subject of the appeal. (*Id.*)

The Second Circuit affirmed the Court's imposition of two of the challenged special conditions and remanded to this Court for further proceedings regarding the third special condition. *Gorychka*, 2024 WL 3964287, at *3. Upon remand from the Second Circuit, and in light of the Circuit's instruction that this Court "expeditiously" provide a basis, if one exists, for the third special condition of supervised release (regarding the monitoring of Defendant's electronic devices), the Court instructed the Government to have Defendant produced as soon as possible. At the time, Defendant was not in this District (or New York), as he had been designated to FCI Milan in Michigan. The Government, working with the U.S. Marshals Service, expeditiously produced Defendant for a conference on September 26, 2024. The Government submitted a letter in advance of the conference explaining why it believe the third special condition was appropriate. (*See* Doc. No. 77.) Gorychka made no submission prior to this conference or seek to rebut the claims the Government made in its letter of September 25, 2024.

The Court had a conference on September 26, 2024. After hearing from counsel for the Government and Gorychka, the Court made certain findings at that conference. This Order incorporates those findings.

## II. Discussion

### A. Standard of Review

"Implicit in the very nature of supervised release is that certain conditions are necessary to effect its purpose." *United States v. Truscello*, 168 F.3d 61, 62 (2d Cir. 1999). Moreover, "[a]

sentencing court may impose special conditions of supervised release that are reasonably related to certain statutory factors governing sentencing," including "the need to protect the public from further crimes of the defendant." *United States v. Gill*, 523 F.3d 107, 109 (2d Cir. 2008) (internal quotation marks omitted); *see also United States v. Eaglin*, 913 F.3d 88, 94 (2d Cir. 2018) (noting that a sentencing court "may impose special conditions of supervised release that are reasonably related to certain statutory factors governing sentencing, involve no greater deprivation of liberty than is reasonably necessary to implement the statutory purposes of sentencing, and are consistent with pertinent Sentencing Commission policy statements." (internal quotation and citation omitted) (alteration adopted)). "A district court retains wide latitude in imposing conditions of supervised release . . . ," *United States v. MacMillen*, 544 F.3d 71, 74 (2d Cir. 2008), including "non-mandatory" or "special conditions" of supervised release, *see United States v. Kunz*, 68 F.4th 748, 758 (2d Cir. 2023) (noting that district courts have discretion to impose "non-mandatory conditions of supervised release," though constrained by the requirements imposed by statute and the Guidelines that such conditions be "reasonably related" to the factors that govern sentencing). In imposing a special condition of supervised release, a sentencing court "is required to make an individualized assessment" and "to state on the record the reason for imposing it." *United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018); *United States v. Matta*, 777 F.3d 116, 122 (2d Cir. 2015) ("The power to impose special conditions of supervised release . . . is vested exclusively in the district court." (citing 18 U.S.C. § 3583)). However, when a sentencing court fails to state its reasons, the sentence may be affirmed "if the district court's reasoning is self-evident in the record." *Kunz*, 68 F.4th at 760 (citation omitted).

Regarding the special condition at issue here, the Second Circuit viewed the computer monitoring requirement as an occupational restriction, as there could be communications between a probation officer and a future employer of Gorychka's about his supervision. *Gorychka*, 2024 WL 3964287, at *2; *see also United States v. Peterson*, 248 F.3d 79, 85–86 (2d Cir. 2001) (reversing a district court's imposition of a "third party notification" special condition, because it was not tethered to conduct related to the offense of conviction and because it involved a delegation of excessive discretion to the probation office). And, as the Second Circuit noted, it has made clear that a "sentencing court may impose an occupational restriction only if it determines that there is a 'reasonably direct relationship' between the defendant's occupation and the defendant's offense conduct, and that the restriction is 'reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar to that for which the defendant was convicted.'" *Gorychka*, 2024 WL 3964287, at *2 (quoting U.S.S.G. § 5F1.5(a)); *see also* U.S.S.G. § 5F1.5(a)(1)-(2) (providing that an occupational restriction may only be imposed if the sentencing court determines that "a reasonably direct relationship existed between the defendant's occupation, business, or profession and the conduct relevant to the offense of conviction," *and* "imposition of such a restriction is reasonably necessary to protect the public because there is reason to believe that, absent such restriction, the defendant will continue to engage in unlawful conduct similar . . . .").

B.  Application

As it implicitly found at the time of sentence, the Court finds here that there is a reasonably direct relationship between Gorychka's occupation and the relevant conduct in this case and that the special condition the Court imposed regarding the monitoring of his computer

10

use, even if related to his work, is reasonably necessary to protect the public, in that the absence of this condition will allow Gorychka to engage in continued conduct that is a danger to children. The findings made herein, and at the September 26 conference, are based solely on the contents of the PSR, to which Gorychka has not objected, and the psychosexual evaluation of Dr. McCarthy.

The Court begins with the first prong of Section 5F.15(a)—the relationship between his occupation and his misconduct. As the Court recounted at the September 26, 2024 conference, the PSR provides a detailed history of Gorychka's troubling conduct directed toward young girls. In particular, Gorychka was recorded in several digital chats with undercover law enforcement officers expressing his interest in having sex with girls between the age of 9 and 15. (PSR ¶ 13.) The chats started when UC-1 told Gorychka that he knew a "pedo mom," who makes some money on the side by offering up the children she supposedly looks after to older men. (PSR ¶ 9.) Gorychka responded to that possibility as being "hot," and asked if he could be introduced to the "pedo mom," who was UC-2. (*Id.*) After the promised introduction, Gorychka spent the next 17 days (including during weekday afternoons) engaging in numerous internet chats with UC-2 about being introduced to young girls (between 9 and 15, but "the young the better") with whom he could have sex, specifically saying he was into "[y]ounger, incest, knotting," and that he liked "foreplay, giving and receiving oral and obviously sex lol."[2] (PSR ¶ 11.) UC-2 also specifically asked, "U ever play or just fantasy???" (*Id.*) Gorychka responded, "The youngest I have been with is 15 . . . and can't seem to find any local girls into knotting." (*Id.*)

---

[2] The PSR does not define "knotting," and the record is otherwise lacking in any explanation as to what Gorychka meant by being into "knotting" with young girls. Internet research yields a variety of references about knotting in the context in which Gorychka used this word. The Court need not pick among those references, or even guess to which one Gorychka was referring, because they all involve sex with minors.

11

During other internet chats, Gorychka asked if UC-2 had pictures of any of the girls to which she could introduce him. (PSR ¶ 12.) UC-2 said she did, but that she did not want to share them in the chat. (*Id.*) On two other occasions, Gorychka sent pictures over the internet of his erect penis and two photos of individuals engaging in sexual activity. (PSR ¶¶ 13–14.) In one of the chats, Gorychka boasted that he was watching some pornographic videos, which he shared with UC-2 via various links, which contained hundreds of videos and images depicting what appeared to be prepubescent children engaging in sexual activity with other children and with adults. (PSR ¶ 14.) The investigation later uncovered that Gorychka possessed in excess of 600 images of child pornography. (PSR ¶ 20.)

The record contains clear evidence that Gorychka's undisputed conduct in this case bore a direct relation to his occupation. One of the photographs of his erect penis that Gorychka shared with UC-2 had a U.S. Army uniform in the background. (PSR ¶ 14.) At the time, Gorychka was a Staff Sergeant in the U.S. Army. (PSR ¶ 19.) Moreover, the IP addresses Gorychka used to communicate with UC-2 were determined to be located both at Gorychka's residence and at West Point, his place of employment, which is unsurprising given Gorychka's work in IT. (*Id.*) Thus, the Court finds that the first prong of the Section 5F1.5(a)(1) is satisfied.

The second prong of Section 5F1.5(a) requires the Court to find that the special condition is necessary to protect the public and that in the absence of the condition, Gorychka likely will continue to engage in illicit conduct. The Court makes this finding, again based on the record that was available to the Court (and the Parties) at sentencing. The starting point is Dr. McCarthy's report, which noted that Gorychka has "problems with sexual self-regulation – marked by deviant sexual interests, using sex to cope, and possibly, sexual preoccupation." (Report at 19.) Indeed, Dr. McCarthy found that Gorychka "does not impress as a

psychologically minded individual and has little to no insight into the motivating factors that led to his offense." (Report at 20.) As a result, Dr. McCarthy recommended that Gorychka's mental status be monitored and that he participate in and successfully complete a sex offender treatment program to assist him "in gaining insight into the motivating factors that led to his offense and focus on identifying and decreasing his dynamic risk factors." (Report at 20–21.) Dr. McCarthy also recommended that Gorychka "should not view or possess any sexually explicit or suggestive material," that he should "complete an Internet Management Plan in treatment," and that *any* access to an Internet-capable device should be monitored by his supervising Probation officer. (Report at 21.)

      The PSR incorporated Dr. McCarthy's evaluation in recommending the special conditions that the Court imposed. Notably, the PSR observed that "[i]t has also been recommended that the defendant refrain from viewing or possessing *any* sexually explicit or suggestive material, to have monitoring software installed on *any* electronic devices, and to complete an Internet Management Plan during treatment." (PSR ¶ 64 (emphasis added).) The Court finds that the record supported that conclusion. Gorychka is an individual whose undisputed conduct in this case strongly suggests he is a danger to children, that he does not have the capacity, without certain conditions, to self-regulate and that the special conditions are necessary to prevent any undermining of those conditions. Only by monitoring his use of any computers to which he has access can the Probation Department assist Gorychka in regulating his behavior and thus avoid future risk to minors. On the other hand, monitoring only Gorychka's personal computers, especially given his admitted IT experience, would create an obvious gap in the Probation Department's efforts to regulate Gorychka's use of the Internet and risk the public's safety. *See United States v. Crandon*, 173 F.3d 122, 127–28 (3d Cir. 1999)

("Crandon used the Internet as a means to develop an illegal sexual relationship with a young girl over a period of several months. Given these compelling circumstances, it seems clear that the condition of release limiting Crandon's Internet access is related to the dual aims of deterring him from recidivism and protecting the public."). Weighed against this, Gorychka has not made any argument, let alone substantiated any argument, that this condition will eliminate his ability to find future employment. *See United States v. Rearden*, 349 F.3d 608, 622 (9th Cir. 2003) (rejecting challenge to work-related computer use monitoring under § 5F1.5(a) and holding that "the district court did not . . . prohibit [the defendant] from working in his previous profession as an art director or set decorator. [The defendant] merely asserts that any condition that restricts him from access to equipment he needs to engage in his profession amounts to an occupational restriction, but absent any showing that any of the conditions would have this effect, the court did not plainly err."); *United States v. Cottom*, No. 15-CR-6054, 2021 WL 5629073, at *3 (W.D.N.Y. Dec. 1, 2021) ("[W]hile Defendant contends that these special conditions make 'employment in [his] line of work impossible,' this argument appears to be mere speculation. Defendant has not identified any particular job that he has been unable to obtain as a result of the special conditions.").

III. Conclusion

For the reasons discussed herein and at the conference of September 26, 2024, the Court finds that the special condition that Gorychka's use of any devices in the course of employment should be subject to monitoring or restriction as permitted by his employer is justified by the record in this case.

SO ORDERED.

Dated: October 16, 2024
        White Plains, New York

KENNETH M. KARAS
United States District Judge